## SCHOOL BOARD OF BREVARD COUNTY v PRICE
### Case No. 85-1804E
State of Florida, Division of Administrative Hearings

August 13, 1985

### APPEARANCES OF COUNSEL

**Bill Walker** for the School Board.

**Tommy L. Price** for the child, Derrick Price.

### OPINION

ELLA JANE P. DAVIS, Hearing Officer.

### *FINAL ORDER*

This cause came on for hearing in Merritt Island, Florida before the Division of Administrative Hearings by its duly designated Hearing Officer, Ella Jane P. Davis on July 22, 1985.

### *EVIDENCE AND POST-TRIAL PROCEDURE*

Petitioner School Board had admitted, without objection, Composite

Exhibit 1 (internally 1-1 through 1-17) and offered the testimony of Cynthia Ford, Director of Admissions and Exceptional Student Education. Mr. and Mrs. Price each testified on Respondent's behalf and offered no exhibits.

No transcript was requested or provided. Both parties waived opportunity to file written proposed findings of fact and conclusions of law.

## ISSUE

The issue in this cause was noticed as:

"Whether the IEP proposed for Derrick Price is appropriate?"

Prior to hearing, in its "Pre-Hearing Compliance Response," the School Board requested that the style of this cause be reversed so that the burden of proof might fall upon the parents as Petitioners, upon the grounds that student Derrick Price had previously been staffed and placed in the emotionally handicapped program with the parents present and participating and had in existence at the present time an Individual Education Program (IEP).

Argument on this issue was heard prior to hearing on the merits and the request was denied. The issues as defined below are encompassed in the May 24, 1985 request (P-1-1) by Mr. and Mrs. Price for a Section 120.57(1) due process hearing. The issues to be determined are, therefore:

1. Whether the existing 1984-1985 IEP devised for Derrick Price was appropriate.

2. Was Derrick Price's 10-day suspension beginning May 22, 1985 improper in light of his IEP?

## FINDINGS OF FACT

1. Mr. and Mrs. Price are active and concerned parents who genuinely worry that the suspension of their son, Derrick, for 10 days during the last two weeks of his three-year Middle School experience has damaged his self-esteem, self-image, and confidence just at a time his grades had taken an upswing in response to an otherwise effective Individual Education Program for the Emotionally Handicapped. The parents expressed concern that mere classification as an emotionally handicapped child in an IEP program comes across to Derrick as a type of discipline/punishment and lowers his self-esteem, but the parents have offered no evidence beyond their "feelings" to support this concept. They further express concern that graduation from an EH program will not allow Derrick to compete on equal footing in life

216

with those in a regular program. The record is devoid of direct, credible evidence to support this perception.

2. Derrick Price, born November 13, 1971, came under consideration for specialized educational placement in the 7th grade (198301984 school year) due to disruptive and aggressive behavior.

3. All prestaffing conference procedures were complied with by the School Board. At the staffing conference, held June 6, 1984, the staffing committee reviewed all available data, determined that the student met the eligibility criteria for "emotionally handicapped," determined the student's present level of performance and affective, behavioral, and academic needs, recommended appropriate placement by completing the Notice and Consent for Placement Form, developed an IEP for the 1984-1985 school year, and developed a written summary of the findings and recommendations. However, for reasons never fully explained, the IEP was not implemented until August 27, 1984.

The IEP provided annual goals of 1) developing and improving self-related behaviors, responses and attitudes, 2) enchancing classroom functioning by improving class-related behavior, responses and attitudes, 3) continuing to develop competencies in all basic subject areas, with emphasis on math and language arts, and 4) increasing participation in mainstream classes, to be implemented by the educationally handicapped teacher. Mrs. Ford testified that these goals could have included some provisions for special disciplinary methods but did not.

Derrick started the 1984-1985 school year in a self-contained emotionally handicapped exceptional education program at Kennedy Middle School. He was gradually mainstreamed in 3 of his total 6 subjects.

Derrick completed the 8th grade (1984-1985 school year) with all passing grades and plans to attend 9th grade at a new senior high with a new principal for the 1985-1986 school year. Mrs. Ford anticipates that an annual review of Derrick's IEP, complete with a new staffing conference and revised IEP for 9th grade will take place before the start of the 1985-1986 school year, probably between August 19 and 26, 1985.

4. The parents participated in the staffing conference on June 6, 1984 (P-1-5) and Mr. Price signed the appropriate Notice and Consent for Placement Form. (P-1-7)

Prior to entering the 1984-1985 school year with an IEP, Derrick had had a lot of behavioral problems resulting in a number of suspensions but also had passing grades in a regular school curriculum with above grade level reading and below grade level math perfor-

mance. The Prices, by their testimony, acknowledge that they participated in the process leading up to the staffing conference, participated in the staffing conference, and agreed to the IEP as drafted. Mr. Price also signed various "addendums" thereto which thereafter gradually increased Derrick's participation in mainstream classes and curriculum. It is not now the parents' contention that Derrick is not emotionally handicapped but that oral representations were made to them by someone connected with the staffing conference committee that in addition to the 4 annual goals listed and in addition to the coursework to be covered, they were required to agree to the 1984-1985 IEP so as to prevent the School Board from suspending or expelling Derrick within/from the 1984-1985 school year.

5. Mrs. Ford, Director of Admissions and Exceptional Student Education, testified that merely being classified as an emotionally handicapped (EH) student and placed in an EH-IEP does not exclude a student from normal disciplinary procedures. She further testified that she knows of no one who would have made a representation to the Prices that there would never be a suspension applied for Derrick's misbehavior. Mrs. Ford was not present at the June 6, 1984 staffing conference which was one occasion when such representation was supposedly made. Mrs. Ford represented that when Derrick's IEP is annually evaluated at the next staffing conference on Derrick, provisions for less drastic discipline could, with the parents' consent, be worked into a new 1984-1985 EH-IEP for Derrick. She stated that these provisions could have been arranged for the current IEP but were not. It is significant that part of the instructions provided on the observation forms leading up to the June 6, 1984 staffing conference specify:

"Attempts should be made in the beginning to give increments of consequence smaller than expulsion. Classroom exclusion should be a final step." (P-1-13)

Although his most recent suspension was toward the end of the school year, there is not direct credible evidence that lesser increments of discipline were attempted before the suspension.

6. The Prices concede that while Derrick has been in the EH category with a structured IEP for the 1984-1985 school year, he has had fewer suspensions than in the last two preceding school years without EH classification and a tailored IEP. Mrs. Ford attributes this decrease of the number of suspensions to greater understanding and consideration given Derrick in the EH-IEP. Both Mr. and Mrs. Price agree that such greater consideration and understanding may have

218

something to do with Derrick's fewer suspensions, but they counter that in their lay opinions, Derrick's recent membership in Boy Scouts and the private emotional therapy they have undertaken at their own expense have had the most beneficial results for Derrick.

7. The evidence affirmatively demonstrates Derrick's grade improvement during the 1984-1985 school year. (P-1-3) The evidence also affirmatively demonstrates that Derrick was suspended for 10 days during the last 10 days of the 1984-1985 school year. (P-1-4) Although the School Board has altered Derrick's records to indicate that he was withdrawn by his parents effective May 22, 1985 and although he has not had inflicted upon him the usual penalty of failing grades for the six weeks' grading period within which his suspension occurred, the testimony of the parents is accepted that they did not withdraw Derrick. It is further found that, despite opportunity to discuss the situation with the principal, and despite Mrs. Ford's testimony that she made many phone calls to investigate the truth of the allegations against Derrick and to express the parents' views to all concerned, this suspension was enforced by the principal against the student, Derrick Price, without a prior formal evidentiary hearing.

8. The School Board presented no direct, credible evidence by which it could be determined that the "battery" of which Derrick was accused and which precipitated the 10-day suspension was *not* a manifestation of his previously determined handicap. The parents concede Derrick continues to have behavioral problems, although they maintain Derrick's behavior has improved. The entire thrust of Mrs. Ford's testimony and of all of Petitioner's exhibits is that Derrick is emotionally handicapped primarily *because* of his unwarranted physical aggression and "acting out" in school. Accordingly, his behavior in the battery incident is found to be a manifestation of his handicap.

## CONCLUSIONS OF LAW

The School Board has sustained its burden of proof to establish that Derrick Price at the time of development of the existing 1984-1985 EH-IEP was an emotionally handicapped child as defined in Rule 6A-6.3016(1), *Florida Administrative Code.*

The parents' concerns that they were deceived or coerced into consenting to the 1984-1985 IEP are immaterial because parents may raise the appropriateness of the IEP or the classification of their child as "emotionally handicapped" at any time, even after agreeing to an IEP initially.

Although the parents have raised the issue of the appropriateness of

219

the IEP, as implemented, they do not truly challenge the classification of Derrick as "emotionally handicapped" at this time. As an emotionally handicapped student, Derrick is entitled to appropriate educational benefits at public expense. The Petitioner's own assessment of desirable behavior modification techniques (P-1-13) strongly suggests that the IEP developed for the 1984-1985 school year was not ideal because it dod not include some known, specific techniques short of expulsion/suspension, but the issue of the 1984-1985's IEP's appropriateness or inappropriateness is moot because the 1984-1985 IEP has expired. Failure to consider disciplinary needs in future annual evaluations/reviews for formulating new IEPs might result in a contrary conclusion and these parties would be well-advised to include the private therapist in future staffing conferences, but the issue is moot for the past year's IEP.

Pursuant to the reasoning of the opinion in *S-1, et al. v. Turlington*, 635 Fed 2d 342 (5th Cir. 1981), it is determined that this emotionally handicapped child was entitled to a due process hearing to determine whether or not his misconduct was a symptom or manifestation of his handicap prior to actually being suspended for disciplinary purposes. That case, unlike this one, involved expulsion (not suspension), but because of the proximity of Derrick's latest suspension to the end of his Middle School experience and because it occurred within the crucial last six weeks' grading period, Derrick's suspension of only 10 days was tantamount to a short-range "change in educational placement" so severe as to constitute *at least a short-range complete cessation of educational services*. In such situations, a 10-day suspension takes on increased significance in relation to the student's academic record because it can follow him all of his life.

The parents timely requested a due process hearing. (P-1-1) The principal's offer of a parental conference and his unilateral determination that suspension was "inappropriate" does not approximate a due process hearing. The instant proceeding held in response to the parents' request (P-1-2) constitutes the required due process hearing but, of course, the suspension was already effected before the hearing could occur.

The School Board bears the burden to establish that the cause for a suspension is *not* a symptom or manifestation of the student's handicap. It has not done so and there is substantial evidence to the contrary, but that issue is also now moot in light of the expiration of the current IEP and the nonimposition of failing grades.

Upon consideration of the foregoing, it is,

220

**ORDERED:**

Since the 1984-1985 IEP has expired, Petitioner School Board shall, pursuant to Rule 6A-6.331(3)(a)5, *Florida Administrative Code*, and Section 230.23(4)(m), *Florida Statutes*, conduct an appropriate and timely annual review to draw up a new IEP for the 1985-1986 9th grade for Derrick Price.

DONE and ORDERED this 13th day of August, 1985, in Tallahassee, Florida.